(*Circuit Court of Cook County. In Chancery.*)

## The Werner Company

### vs.

## W. B. Conkey Company, et al.

(December 8, 1893.)

BUSINESS PLANS AND SYSTEMS — INJUNCTION AGAINST USE OF. The complainants commenced issuing in serial parts a portfolio of sights and scenes of the world. These parts were issued and distributed under contract by certain newspapers in exchange for coupons clipped from such newspapers. This plan was originated by the complainants and proved to be a great success. The defendants thereafter issued a similar book and adopted substantially the same plan in doing its business. The parts were not copyrighted and the original pictures were purchased in the open market. *Held*, there being no copyright, trade-mark or trade name involved, that a court of equity would not grant relief, as there can be no proprietary rights merely in a plan of doing business.

Motion to dissolve injunction. Heard before Judge Oliver H. Horton. Injunction dissolved. For statement of facts see opinion.

*Partridge & Partridge, A. M. Pence* and *Newman & Northrup,* for complainant.

*Moran, Kraus & Mayer,* for defendant.

HORTON, J.:—

In this case of the *Werner Company v. W. B. Conkey Company, et al.*—motion to dissolve injunction—counsel will of course bear in mind that there is a very large record, that elaborate arguments continuing for several days were concluded last night, and that therefore the court has had no time to prepare a written opinion. Like most oral opinions it will probably be too lengthy. I think, however, I can express my views.

September 15th, 1893, the complainant commenced issuing in serial parts under the title "John L. Stoddard's Portfolio of Photographs of Famous Cities, Scenes and Paintings," the

book owned by the defendant entitled "Glimpses of the World, or photographs prepared under the supervision of John L. Stoddard." The book has, including the blanks, some 550 pages, and about 265 cuts, and is to be issued in sixteen parts.

October 28th, 1893, the defendant commenced issuing in serial parts under the title "Sights and Scenes of the World, a series of magnificent photographic views, embracing the world of nature and art," the book which it then owned entitled "Sights and Scenes of the World," which embraced some 700 pages, including the blanks, and some 345 cuts, and is to be issued in twenty parts.

This bill was filed November 27th. The mode of doing business adopted by complainant was to negotiate a contract with publishers of newspapers to furnish these serial parts and to furnish cuts and the matter for various advertisements in the newspapers. The "parts" are sold on what is known as the coupon system, by the newspapers. That is, a certain number of coupons cut out of a newspaper will entitle the holder of those coupons, by paying four two-cent stamps, to one of these parts. The complainant claims to have originated this "plan" of doing business. The defendant pursued substantially the same plan in doing its business. The plan has proved to be a great success. The sales by both parties are such as impress the court as being almost incredible. Some six or seven millions of these parts have been sold by the two parties up to the time of the filing of the bill; and the defendant sold inside of four weeks between three and four million copies on contracts. I do not understand they are all delivered yet. This shows that the scheme or plan or device—this mode of doing business—whatever you see fit to call it—has been a great success. Complainant commenced about six weeks before the defendant did. Originally both of the books were copyrighted. There is no copyright upon the parts as such, as I understand it. It is, however, conceded in this case, that there is no copyright involved on either side, that there is no trade mark involved on either side, and no trade name involved.

The complainant claims protection in a court of equity of a property right consisting of good-will, plan of doing business, mode of advertising, selling a book in parts on the coupon system through the newspapers, etc., making up what it calls its whole "plan for doing business." The similarity which it is claimed the defendant adopted aside from the general plan of doing business, and as furnished me by one of the counsel for complainant, is: 1, the color of the covers; 2, the number and size of the pictures; 3, the style of the pictures; 4, the number of pictures in each part; 5, style of descriptive matter; 6, quality of paper; 7, size of the sheets; 8, mode of advertising (A, full page; B, three columns; C, two columns); 9, by the payment of postage stamps; 10, issuing the same in series.

The complainant did not, and I think does not, claim to have originated the plan of procuring and printing in half-tones, etc., photographs of the sizes here used, nor of printing on both sides of the paper, nor of the descriptive words printed beneath the picture; nor is it claimed that the photographs from which these half-tone pictures are made were taken by, or at the expense, or under the immediate direction of complainant. The originals were purchased in the open market. It is evident from the book which has been offered in evidence here—entitled "Scenes From Every Land, over 500 Photographic Views"—that none of these features which I have just mentioned are new—strictly so. The cuts in that book are printed on both sides of the paper, are similar in size, have similar descriptive matter, etc. Schepp's book, which has also been offered in evidence, is in many respects very similar. It has a different size page or cut, but in many respects it is very similar.

In so far as complainant's claim is not based upon original plans or matter it cannot receive the protection of a court of equity. And if it be true, as argued by one or more of the counsel, that both of these parties are "pirates," using the word in a legal sense, no relief can be granted. The court cannot interfere at the instance of one imitator for the sole benefit of another. Defendant has nowhere used the same

imprint complainant has used. The imprints upon the complainant's works are upon the book, "Photo Publishing Company," and upon the parts, "Published weekly by Educational Publishing Company, Chicago." The imprint on defendant's book is "George W. Ogilvie & Company, Publishers, 334 Dearborn Street, Chicago, Illinois," and upon its parts, "W. B. Conkey, Publishers, Chicago." Nowhere is the imprint of complainant upon any of the books or productions of defendant. There is no evidence or indication upon the complainant's book or parts that it has any interest whatever in either the Photo Publishing Company or the Educational Publishing Company. There may be something in some of the "ads" about that, but I have not discovered it; nor is there any evidence as to whether the Educational Publishing Company or the Photo Publishing Company is incorporated, or is a firm. There is a statement in the bill, or it was stated in argument, I am unable at this moment to say which, that these are simply imprints that the complainant has put upon its publications.

There is no evidence in the case that any one has been actually deceived. That defendant adopted the plan and similarity of parts, similarity of advertisements and general plan of doing business, etc., can hardly be doubted. If defendant had a legal right so to do this injunction must be dissolved. This court cannot deal with moral rights, or obligations, or duties, nor can it deal with business morals or business ethics or business courtesies.

There can be no proprietary rights in a "plan of doing business" separate and distinct from any other matter. There cannot be any proprietary rights in simply a mode of doing business.

It is practically conceded on the part of complainant that its right to maintain this bill does not rest, and could not be maintained upon any one point of imitation. The right it claims lies in the fact that the defendant has adopted its plan as a whole by imitating the parts, so called, and the advertisement and the coupon plan, etc. I do not recall a case in the books in which an injunction has been sustained where there

was neither a trade mark nor a trade name (in either the name of the producer or the article produced, or place of production) ; where there was no evidence of any actual damage to complainant, or that any one has been deceived or defrauded by the alleged piracy.   Without quoting it I will refer to 2 High on Injunctions, 3d ed., sec. 1086, as defining this principle substantially as I understand it to be in the books.   A large number of authorities have been cited, and what little I can do in reviewing these authorities must be from memory, substantially so.   Cases in 2 Abbott's Practice, N. S., 459 (*Matsell v. Flanagan*), *Enoch Morgan's Sons Co. v. Schwachofer*, 5 Abbott's New Cases, 265, and *Enoch Morgan's Sons Co. v. Troxell*, 89 N. Y. 292, are what are called the "Sapolio cases."   In the one case the word "Saphia" was adopted in place of the word "Sapolio."   These words resemble each other much more to the eye than they do to the ear.   In the court below an injunction was sustained. One of these cases went to the supreme court of appeals of New York and was reversed.   The same language substantially was used by the court in both of the *Nisi Prius* cases. The interference there was alleged to be in the size and form of package, that they were both wrapped in tin foil, that they both had an ultra-marine blue band around them with gold letters printed thereon, etc.   They were substantially the same except the words "Sapolio" and "Saphia."   But it appears in those cases that the manufacturers, Enoch Morgan's Sons, had been long using and had established this trade mark or trade name "Sapolio."

The case of *McLean v. Fleming*, 96 U. S. 245, is in regard to the manufacture or rather the mode of putting up "dressing" as it is called by some of the books—Dr. McLean's pills. There the court held that there was a great similarity in the red seal on top of the boxes, same size and kind of boxes, and same band around the boxes, the name being similar, etc., and held that these constituted a trade mark which had been pirated.   The cases of *Estes v. Williams*, 21 Fed. 189, and *Estes v. Worthington*, 31 Fed. 156, were what are known as the "Chatterbox cases."   Some years ago I had occasion

to know about those cases and was employed in connection with bills filed in this district against parties for pirating that work, or pirating by productions called "Chatterbox." Those cases, I think, if I recollect them correctly, turn almost entirely upon the word "Chatterbox" as a trade mark, as applied to juvenile productions. I have not read them for years. I think that is so—as a trade name or trade mark. In the Fairbank's Scales case that is reported in 14 Blatchford, 337 (*Fairbanks v. Jacobus,* Fed. Cas. No. 4,608), there was a very marked similarity, absolute reproduction, or substantially so. Yet the court held that it was not an infringement. There is the case of *Broham .v. Bustard,* 1 Hemming & Miller, 447, which is known as the "Excelsior White Soft Soap case." There the infringement or piracy was enjoined upon the basis that "Excelsior" was a trade mark or trade name; that the owner had established a right to it and could not be interfered with, and that the defendant had pirated that name. Substantially the same is the "Birthday Text book" case, *Mack v. Petter,* L. R. 14 Eq. 431, 41 Law Journal Rep. Chancery 781.

Reference has been made to the Elgin Watch case which is reported in the Legal News of December 24th, 1892, page 142 (*Elgin Nat. Watch Co. v. Eppenstein*). I have some familiarity with that case. That opinion does not refer to all of the facts of course. A number of watch cases were produced having the mark "Elgin Watch Case" on them, and a large number of affidavits showing where dealers and purchasers had been actually deceived.

There are two cases in the supreme court in this state, the first being *Candee & Co. v. Deere & Co.,* 54 Ill. 439. That is what is known as the "Moline Plow case." Without attempting to review that case except from memory, the complainant claimed, I think, a trade mark or trade name in the words "Moline Plow." Something like that. I may not be technically accurate, but plaintiffs there had not always used that name on the plows which they had sent out, and the court held substantially that a mere declaration that they claimed it as a trade mark or name was not sufficient. That

is one feature of that case. The court also defined a trade mark, what it is, etc. I will not attempt to review these details, gentlemen. You are too familiar with them. The 116 Ill. 137, is the case of *Ball v. Siegel.* The difference there was in the name of the proprietor preceding the words "Health Preserving Corset," the one being "Ball's Health Preserving Corset," and the other "Schilling's Health Preserving Corset," if I remember correctly. There it was held that it was not a piracy, they not being sufficiently similar. These are all the cases that it seems to me necessary to refer to. I refer to them for one thing, to show that in every instance a trade mark or trade name was the point in the case, and to show also that there must be such a similarity as to amount to actual deceit or evidence that there has been actual fraud upon the public.

This is a very peculiar business. Neither of the parties sell directly to what we may call the consumers. There is no evidence that any proprietor of any newspaper has been deceived. No one claims that. The contracts which have been produced show that they specifically describe what the parties are buying, or what they are contracting to buy. These parts are not laid before a purchaser as books ordinarily are in a store where he might be deceived in picking up one for the other. They are not presented to the customer in that way at all. They are sold by a coupon system. Those coupons and the advertisements in regard to them do not in any way show this similarity that is urged here of color of cover, and all these various details. It is difficult to see how the public can be mislead or deceived as to a thing they never see so far as that deception might be based upon observation. They buy simply from the coupons, and they get what the coupons advertise are to be furnished. The main, or perhaps I should say the prominent thing in the complainant's "ads" and title page is the word "Stoddard," or the name "John L. Stoddard." Take the cover and title page of complainant's book, and the name "John L. Stoddard" is only inferior in prominence and size to the words, "Glimpses of the World." The printed cover of the complainant's parts, the first words on it,

7

except some of the smaller words as to the series, etc., are "John L. Stoddard's Portfolio of Photographs." On the inside of the back cover, substantially the most prominent letters are John L. Stoddard. His lectures and his ability are there described. Not only that but the first cut in the book is Stoddard's portrait, keeping the idea of "Stoddard" before the public. And it was undoubtedly a very taking thing, a very taking idea to keep it prominent. It is, perhaps, the most prominent thing in its "ads."

Take the first full page "ad." It commences, "A Trip Around the World with John L. Stoddard." That is kept prominent. There is a cut of him upon that full page "ad," on a pedestal of honor I think, or something of that kind, and "Stoddard" is kept forward all the way through. It strikes me as a very sagacious mode of advertising, very shrewd. The defendants, however, do not use that cut, nor the name "Stoddard" anywhere in any of their advertisements I think except the one that was charged to have been published by and with the cognizance or approval of the defendant in the Minneapolis Journal. The evidence here shows that the moment that was brought to its attention, the defendant repudiated it by wire and ordered it stopped and by letter notified the publishers that they must not use any such advertisement This would negative the idea of an intention in that way to pirate this name.

There are some of the smaller features, perhaps, that I need not call attention to. The colors are undoubtedly substantially similar; whether it was intended to simulate or not, it has been done. But the title page of the parts is so very different that it does not seem to me that any book buyer would be deceived if he was looking at them. The defendant's "parts" have a large telescope which is a prominent thing on the cover, with parties looking through it, or purporting to do so. In the advertisements the defendant undoubtedly uses the same sizes with new matter in each issue of the paper. But it did one thing that the complainant did not. It issued what it calls a "Supplement," which is one of the full pages of one of the parts printed on both sides, showing the size and kind of cut, etc., at the top of which

is printed in the one now before me, "Sights and Scenes of the World. Supplement to the Detroit Journal, Detroit, Michigan, November 18th, 1893." All of them which have been shown to me are the same except the name of the paper and the date. That is a thing that is not adopted by the complainant.

In this kind of business neither of these parties can have any competitor in the same city or town under their mode of contracting. Now if this injunction is sustained, then no newspaper can issue or sell a similar publication in parts in any city or town where the complainant has made a contract. In other words, the complainant has a monopoly of the whole business. The plan of doing business, if subjected to the proprietary right and sustained as such, is a monopoly. It seems to me that complainant's claim may be called a "trade right" as well as any other name that I think of. It is new, but I am not prepared to say but that such a right might, under certain circumstances, be sustained by a court of equity. I do not, however, see how it can be sustained in this case.

A trade mark is defined by our supreme court in the 54th Illinois in the case of *Candee v. Deere,* and I will only read the syllabus now (54 Ill. 439). "A trade mark is the name, symbol, figure, letter, or device adopted and used by a manufacturer or merchant in order to designate the goods he manufactures, or sells, and distinguish them from those manufactured or sold by another, to the end that they may be known in the market as his, and thus enable him to secure such profits as result from a reputation for superior skill, industry and enterprise. It must be so clear and well defined as to give notice to others. It must be attached to the manufactured article," etc.

Now a "trade right" must have some of the defining features, some of the rights or merits that underlie a trade mark or a trade name. In either case it must be adopted and used.

The plan of doing business being eliminated, there is nothing left to support this case that can be a matter of copyright or trade right. I see no cause but to conclude, as I have somewhat reluctantly, that this injunction must be dissolved.